IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RONALD G.,[1]                                                    Case No. 3:22-cv-00856-SB

                Plaintiff,                           **OPINION AND ORDER**

        v.

KILOLO KIJAKAZI, Acting Commissioner of
Social Security,

               Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Ronald G. ("Plaintiff") brings this appeal challenging the Commissioner of Social

Security's ("Commissioner") denial of his applications for a period of disability, Disability

Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act. The Court has jurisdiction over this matter pursuant to 42 U.S.C.

§§ 405(g) and 1383(c), and the parties have consented to the jurisdiction of a magistrate judge

pursuant to 28 U.S.C. § 636(c). For the reasons explained below, the Court affirms the

_____

      [1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case.

PAGE 1 – OPINION AND ORDER

Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

## STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "not supported by substantial evidence or based on legal error." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* Where the record as a whole can support either the grant or denial of Social Security benefits, the district court "may not substitute [its] judgment for the [Commissioner's]." *Bray*, 554 F.3d at 1222 (quoting *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## BACKGROUND

## I.    PLAINTIFF'S APPLICATIONS

Plaintiff was born in October 1966, making him fifty years old on October 27, 2016, his amended alleged disability onset date. (Tr. 6-7, 106, 118, 133, 146.) Plaintiff is a high school graduate who has past relevant work experience as a painter and house repairer. (*Id.* at 36, 47, 199.) In his applications for benefits, Plaintiff alleges disability due primarily to neuropathy in

his feet, shoulder and knee pain, carpal tunnel syndrome, and tendonitis. (*Id.* at 107, 119, 134, 147.)

The Commissioner denied Plaintiff's applications initially and upon reconsideration, and on January 15, 2019, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 164.) On October 25, 2019, Plaintiff, a vocational expert ("VE"), and a medical expert, Joselyn Bailey, M.D. ("Dr. Bailey"), appeared and testified at a hearing before the ALJ. (*Id.* at 45-75.) On December 3, 2019, the ALJ issued a written decision denying Plaintiff's applications. (*Id.* at 164-72.)

On August 28, 2020, the Appeals Council granted Plaintiff's request to review the ALJ's decision. (*Id.* at 178-81, 187.) The Appeals Council vacated the ALJ's decision because the ALJ failed to address "all of [Dr. Bailey's] assessed limitations," and instructed the ALJ on remand to "[g]ive further consideration to Dr. Bailey's opinion" and "[o]btain supplemental evidence from a [VE]." (*Id.* at 178-81, 187.) On December 9, 2020, Plaintiff, a VE, and a medical expert, Minh Vu, M.D. ("Dr. Vu"), appeared and testified at a second hearing before a new ALJ. (*Id.* at 14-42.) On March 24, 2021, the ALJ issued a written decision denying Plaintiff's applications. (*Id.* at 187-201.)

On January 28, 2022, the Appeals Council granted Plaintiff's request to review the ALJ's decision. (*Id.* at 375-79.) The Appeals Council informed Plaintiff that it planned to issue an unfavorable decision adopting most of the ALJ's findings, but it proposed finding Dr. Bailey's opinion unpersuasive on other grounds because the ALJ "did not properly evaluate" Dr. Bailey's opinion. (*Id.*) After receiving "no statement or additional evidence" from Plaintiff regarding its proposal, the Appeals Council issued an unfavorable decision on April 20, 2022, adopting most of the ALJ's findings and finding Dr. Bailey's opinion unpersuasive for reasons different than

those stated in the ALJ's decision. (*Id.* at 4-7.) Plaintiff now seeks judicial review of that decision.

## II.    THE SEQUENTIAL PROCESS

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 724-25.

The claimant bears the burden of proof for the first four steps. *See Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *See id.* at 954. The Commissioner bears the burden of proof at step five, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett*, 180 F.3d at 1100. If the Commissioner fails to meet this burden, the claimant is disabled. *See Bustamante*, 262 F.3d at 954.

///

///

PAGE 4 – OPINION AND ORDER

### III.    THE ALJ'S DECISION

The ALJ applied the five-step sequential evaluation process to determine if Plaintiff is disabled. (Tr. 187-201.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 27, 2016, his amended alleged disability onset date. (*Id.* at 190.) At step two, the ALJ determined that Plaintiff suffers from the following severe, medically determinable impairments: "carpal tunnel syndrome, cardiomyopathy, neuropathy, left shoulder supraspinatus tear, and bilateral tendonitis[.]" (*Id.* at 190.) At step three, the ALJ concluded that Plaintiff did not have an impairment that meets or medically equals a listed impairment. (*Id.* at 192.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work, subject to these limitations: (1) Plaintiff can sit, stand, and walk for six hours during an eight-hour workday, (2) Plaintiff can never climb ladders, ropes, or scaffolds, (3) Plaintiff can occasionally use foot controls, balance, stoop, kneel, crouch, crawl, reach overhead, and climb ramps and stairs, (4) Plaintiff can frequently "reach in all other directions," handle, finger, and feel, (5) Plaintiff "should not have concentrated exposure to vibration," and (6) Plaintiff "should have no exposure to hazards." (*Id.*) At step four, the ALJ concluded that Plaintiff was unable to perform his past relevant work. (*Id.* at 199.) At step five, the ALJ determined that Plaintiff was not disabled because a significant number of jobs existed in the national economy that he could perform, including work as a cashier II, mail clerk, and marker. (*Id.* at 201.)

### DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred in two principal ways. First, Plaintiff argues that the ALJ failed to provide clear and convincing reasons, supported by substantial evidence, for discounting Plaintiff's symptom testimony. (Pl.'s Opening Br. ("Pl.'s Br.") at 5-9,

ECF No. 36.) Second, Plaintiff argues that substantial evidence does not support the ALJ's explanation for discounting the opinion of Dr. Bailey, the medical expert who testified at the first hearing. (*Id.* at 5, 9-10.) As explained below, the Court finds that the ALJ's decision is free of harmful legal error and supported by substantial evidence, and thus affirms the Commissioner's decision.

## I.    PLAINTIFF'S SYMPTOM TESTIMONY

### A.    Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted).

### B.    Analysis

There is no evidence of malingering here and the ALJ determined that Plaintiff provided objective medical evidence of underlying impairments which might reasonably produce the symptoms alleged. (*See* Tr. 193, reflecting that the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms"). The ALJ was therefore required to provide clear and convincing reasons for discounting Plaintiff's

symptom testimony. *See Ghanim*, 763 F.3d at 1163. The Court finds that the ALJ met that standard here.

### 1.    Improvement, Effective Treatment, and Work Activities

It is well settled that an ALJ may discount a claimant's testimony based on evidence that his symptoms improved with treatment or were well controlled with medication. For example, in *Burkett v. Saul*, 806 F. App'x 509, 512 (9th Cir. 2020), the Ninth Circuit held that the ALJ provided clear and convincing reasons for discounting the claimant's symptom testimony, and in doing so, noted that the ALJ appropriately found that the claimant's testimony was inconsistent with "record evidence that her kidney disease had improved, record evidence that her hypertension was under control, and record evidence that her depression [was] well controlled (when on medication regularly)." *Id.* (simplified); *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (explaining that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits").

Similarly, in *Basoff v. Saul*, 812 F. App'x 483, 485 (9th Cir. 2020), the Ninth Circuit determined that "[s]ubstantial evidence support[ed] the ALJ's rejection of [the claimant's] testimony." *Id.* In support of its holding that the ALJ provided several clear and convincing reasons for discounting the claimant's testimony, the Ninth Circuit observed that the ALJ "specifically noted . . . that contrary to her assertions, [the claimant's] symptoms seemed well-controlled with medication, including the symptoms associated with her kidney disease[.]" *Id.*; *see also Stout v. Berryhill*, 696 F. App'x 838, 839 (9th Cir. 2017) (noting that substantial evidence supported the ALJ's finding that the claimant's "back pain was fairly well controlled with medications"); *Nollen v. Astrue*, 473 F. App'x 780, 780-81 (9th Cir. 2012) (explaining that the claimant's "treating medical records support[ed] [the ALJ's] findings," including the ALJ's

finding that the claimant's "pain was pretty well controlled with medication"); *Elleston v. Astrue*, 319 F. App'x 621, 622 (9th Cir. 2009) (stating that the claimant "suffer[ed] from Crohn's disease, [but] the ALJ correctly noted that this condition was effectively controlled with medication").

Before making specific findings, the ALJ here made use of the following boilerplate language often included in disability determinations: "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 193.) This language alone does not meet the Ninth Circuit's specificity requirements. *See Finney v. Kijakazi*, No. 22-15143, 2022 WL 17830000, at *1 n.1 (9th Cir. Dec. 21, 2022) ("The ALJ . . . made use of boilerplate language stating that [the plaintiff's] statements are 'not entirely consistent with the medical evidence and other evidence in the record.' This boilerplate explanation is insufficiently specific.") (citation omitted). The ALJ, however, did not rely solely on this language and proceeded to give specific reasons for discounting Plaintiff's symptom testimony.

For example, after considering and summarizing Plaintiff's medical records (*see* Tr. 193-96), the ALJ explained that "the medical record supports the functional limitations detailed in the [RFC]," and noted that the "treatment record . . . revealed [that Plaintiff's] symptoms improved with appropriate treatment." (*Id.* at 196.) In support of these findings, the ALJ cited several examples, including, but not limited to: (1) on February 9, 2017, Plaintiff's long-time primary care physician, Michael Pinn, M.D. ("Dr. Pinn"), observed that Plaintiff's "[lower extremity] peripheral neuropathy [was] well controlled with nortriptyline," and (2) on January 29, 2020, during an "annual exam," Dr. Pinn reiterated that Plaintiff's "alcoholic peripheral neuropathy

symptoms were fairly controlled with medication[.]" (*Id.* at 196-97, citing Tr. 1386-87, 2223.) The ALJ also noted that the record included reports that Plaintiff's shoulder pain and limitations improved with physical therapy and cortisone injections, and a recent annual exam note stating that Plaintiff was "feeling good and his only complaint . . . was [a] recurrence of carpal tunnel syndrome in his right hand," which Plaintiff was "hoping . . . would improve" given that he attributed the symptoms to "painting a house, which was now finished[.]" (*Id.*, citing Tr. 2011, 2221, 2050.)

Plaintiff argues that substantial evidence does not support the ALJ's findings that Plaintiff's neuropathy was well controlled with medication and Plaintiff's shoulder conditions improved with treatment (i.e., cortisone injections and physical therapy). (*See* Pl.'s Br. at 7-9; Pl.'s Reply Br. at 1-4, ECF No. 44.) Plaintiff emphasizes that the ALJ failed to account for the fact that medication alone did not control Plaintiff peripheral neuropathy; rather, Plaintiff needed to take medication and regularly elevate his feet. (*See* Pl.'s Br. at 7-8, 10; Pl.'s Reply Br. at 1-2.) Plaintiff also emphasizes that his shoulder treatment only resulted in temporary improvement. (Pl.'s Br. at 8.)

It is true that Plaintiff testified that he needs to elevate his feet at or above hip level to adequately relieve his neuropathy symptoms, and that his shoulder treatment, such as injections, provided only temporary relief. (*See* Tr. 26-27, 29, December 9, 2020, Plaintiff testified at a hearing that the neuropathy in his feet "gets worse within a couple hours" of walking or standing, he relieves the tingling, stinging, and numbness by sitting "straight up with [his] legs straight out for a period of time" at hip level or above, the "same thing" occurs with sitting but "just not as fast," he is "good for about two hours on [his] feet" and then needs to "sit with [his] feet straight out," and the cortisone injections in his shoulder provided "relie[f] . . . for a couple of weeks"

and "gives [him] a break" but his providers recommend that he only "get one [injection] every

four months"; *id.* at 56-57, October 25, 2019, Plaintiff testified at a hearing and estimated that he

would need to sit down after two hours of standing at a workstation due to the neuropathy in his

feet; *id.* at 460-62, 465, 467, March 14, 2018, Plaintiff completed an adult function report and

explained that his ability to stand and walk is limited, he "spend[s] most of [his] day with [his]

feet elevated to try and relieve [his] foot pain," and "laying down is a bad position for [his]

neuropathy").

      Given the record evidence described below, the Court concludes that substantial evidence

supports the ALJ's decision to discount Plaintiff's testimony on the grounds that Plaintiff's

neuropathy was well controlled with medication and Plaintiff's shoulder conditions improved

with treatment, such as cortisone injections and physical therapy. *See generally Ahearn v. Saul*,

988 F.3d 1111, 1115 (9th Cir. 2021) ("[T]he threshold for [substantial] evidentiary sufficiency is

not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

(quoting *Biestek v. Berryhill*, 587 U.S. ---- , 139 S. Ct. 1148, 1154 (2019))). In the Court's view,

Plaintiff advocates for alternatives to the ALJ's rational interpretation of the record, and thus

fails to demonstrate harmful error. *See Vazquez v. Kijakazi*, No. 22-35642, 2023 WL 5453198, at

*1 (9th Cir. Aug. 24, 2023) ("[T]he ALJ's alternative interpretation . . . is at least equally

rational, and the reasoning is legally sufficient."); *Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir.

2020) ("If the evidence is susceptible to more than one rational interpretation, it is the ALJ's

conclusion that must be upheld.") (simplified); *Crawford v. Berryhill*, 745 F. App'x 751, 753

(9th Cir. 2018) (rejecting objections to the ALJ's findings because they "amount[ed] to

advocating for alternatives to the ALJ's rational interpretation of the record and therefore [did] not demonstrate error").

The following records, most of which the ALJ cited,[2] support the Court's conclusion that the ALJ's interpretation of evidence was rational. Indeed, the records suggest that Plaintiff's neuropathy was controlled with medication alone, Plaintiff's medical providers did not state that Plaintiff's ability to control his neuropathy symptoms depended on whether he regularly elevated his feet throughout the day, Plaintiff's shoulder symptoms improved with treatment, and Plaintiff's activities (and failure to follow treatment recommendations) exacerbated his pain and symptoms:

- October 27, 2015: Plaintiff's provider noted that Plaintiff complained of shoulder pain but "does well at the gym," and Plaintiff reported that he worked part-time "painting and [working on] decks," he had not "been doing as much lately," he "[l]ikes to fish and go to the gym," and "[k]ayaking hurts" his shoulder. (*Id.* at 1606-09.)

- February 9, 2016: Plaintiff presented for his "annual exam" and Dr. Pinn noted that Plaintiff was "feeling good and ha[d] no complaints" and had "pain from his peripheral neuropathy in his legs, but [it was] fairly well controlled with gabapentin." (*Id.* at 1425.)

- February 16, 2016: Plaintiff presented for a physical therapy consultation and reported that he had "not been working for several months due to shoulder pain," he

---

[2] "The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied." *Fenton v. Colvin*, No. 6:14-cv-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) (citing *Warre*, 439 F.3d at 1005 n.3).

was "returning to full-time construction work in two days," he "scheduled [a] cortisone shot [the next] week," and he had previously engaged in "physical therapy for [his] shoulder and reported much improvement in [his] pain level with [the home exercise program]." (*Id.* at 1596-96.)

- February 9, 2017: Plaintiff's provider noted that Plaintiff had "years of multiple injuries to his left shoulder," Plaintiff was "currently experienc[ing] 3/10 dull, non-radiating pain elicited with movement and worst when he [was] working overhead (which is often, as he []is a manual laborer)," and Plaintiff "had success with [physical therapy] before and would like to pursue that again." (*Id.* at 1772-73.)

- March 10, 2017: During a physical therapy consultation, Plaintiff reported that his work consisted of "[]construciton/[r]emodeling . . . [i.e.,] [p]hysical stuff," he "[n]o longer ha[d] gym access," his cortisone injection the previous year was "[n]o help," he was "[d]oing T-Bands and light weights at home to tolerance," his left shoulder was "more limited than [his right]," and he "[l]ikes to fish and kayak but [his left] shoulder [was] too limiting." (*Id.* at 1586-89.)

- March 31, 2017: Plaintiff reported that his left shoulder had not improved or worsened, he was "[s]till active," and he "[s]trained his back at work [and thus had] been off [for two] days." (*Id.* at 1774.)

- June 12, 2017: During an orthopedic surgery consultation regarding Plaintiff's left shoulder, Plaintiff denied decreased range of motion or strength, Plaintiff reported that he took three "Advil at night primarily for [lower extremity] neuropathy," Plaintiff stated that he "participated in [three] separate sessions of formal [physical therapy] and continue[d] with a [home exercise program]," Plaintiff's provider

diagnosed Plaintiff with left shoulder tendinopathy, partial thickness rotator cuff tear, and mild biceps tendonitis, and Plaintiff's provider administered a subacromial cortisone injection after advising Plaintiff that there was "no surgical indication for his [diagnoses]," including rotator cuff "repair or [subacromial decompression]." (*Id.* at 1760-63.)

- February 9, 2018: During an annual exam, Plaintiff reported that he had been suffering from right shoulder pain for four weeks, his pain started when he was "pruning some trees at the beginning of January 2018" and had not resolved, he only experienced the pain when he "move[d] his arm forward or to the side, away from his body," as he often does during his "work[] in construction," he has had chronic neuropathy since 2011, his nortriptyline "helps him 'get moving,'" and "a supplement [from the] vitamin store . . . provides him with some relief as well." (*Id.* at 1736, 1746-48.)

- March 21, 2018: Plaintiff complained of pain on the "front side [of his] left shoulder with movement and with weight or pressure" and Plaintiff reported that he was "in construction and remodeling and [thought] he did it at work," he "stretches and rests [his shoulder] every afternoon, but works in the morning daily," and he wanted to engage in physical therapy "like before" and use a "dexamethasone patch again." (*Id.* at 1740.)

- April 30, 2018: Plaintiff reported that he was having "left shoulder pain again, and hoping for similar treatment [as the] last [time,] which he found very helpful," and Plaintiff's provider noted that Plaintiff's "pain [was] better" after a "cortisone injection" and physical therapy, Plaintiff recently stopped his home exercise program,

Plaintiff would "likely benefit from [a] highly structured [home exercise program] which was designed [that day]," and Plaintiff was "willing to proceed on his own" with the home exercise program and return if his "shoulder symptoms g[ot] worse." (*Id.* at 2010-12.)

- August 14, 2018: Plaintiff reported that he was "having issues with his left shoulder," he was "going on [four] weeks of rest without relief," he "completed [physical therapy] a few months ago for [both] shoulders," his "right shoulder [was] good but [there was] no improvement in the left," which "got worse," and he was in Arizona because his father was "in the [h]ospital and his [m]other require[d] [twenty-four hour] care." (*Id.* at 2007.)

- August 24, 2018: Plaintiff complained of ongoing left shoulder pain and reported that he "saw orthopedics in May of last year and was referred to physical therapy [and] receiv[ed] a subacromial cortisone shot," he had "very brief relief from the shot and physical therapy saw him once and gave him exercises to do at home," and he "works in construction and his shoulder pain significantly affects his ability to work." (*Id.* at 2005.)

- October 22, 2018: During an orthopedic surgery consultation regarding Plaintiff's left shoulder, Plaintiff reported that his June 2017 subacromial steroid injection "fully resolved his 'bursal' pain," Plaintiff stated that he had been attending physical therapy but had "an insidious onset of pain" in or around February 2018, which "worsened over the past [six months]," and Plaintiff's provider explained that if a magnetic resonance imaging ("MRI") did not reveal a "full thickness tear, which would warrant surgical consideration," Plaintiff should "consider [another]

subacromial injection, as this ha[d] provided significant relief in the past." (*Id.* at 2050-52.)

- November 27, 2018: Plaintiff's provider noted that Plaintiff's recent MRI findings revealed that he was "not a surgical candidate," she administered a subacromial injection, Plaintiff "reported both improvement in his shoulder pain and . . . [range of motion]" after the injection, she recommended that Plaintiff "contin[ue] with [his] stretching and [physical therapy] exercises," Plaintiff worked "as an independent contractor," Plaintiff was "very active with his shoulder for work and . . . aware that his work aggravate[d] his shoulder pain," and she "[r]ecommend[ed] [that Plaintiff] limit[] [shoulder] movements that exacerbate his pain, [but Plaintiff] admit[ted] this will be difficult for him given his job [as an] independent con[tractor]." (*Id.* at 2115-17.)

- January 29, 2019: During his annual exam, Plaintiff reported that he was "generally feeling good," had "no complaints" and "[n]o pain," and was drinking two to three "beers daily." (*Id.* at 2106-09.)

- June 26, 2019: During a post-"ladder incident" follow-up visit regarding a nondisplaced fracture at the base of his fifth metatarsal, Plaintiff reported that his foot was "50% better" after wearing a "fracture boot for about [two and a half weeks and] then transition[ing] to a stiff work shoe" and he was "still working about [four] hours daily." (*Id.* at 2042-43; *see also* Tr. 2089, June 6, 2019, Plaintiff reported that "he was on a ladder [the previous day] that collapsed and [he] landed a[wk]wardly on his right foot" and his headaches were "improving and overall controlled with 'Advil' when needed").

- January 29, 2020: During his annual exam, Plaintiff reported that he was "feeling good," his "only complaint . . . [was] a recurrence of a carpal tunnel syndrome in his right hand," and he "had been painting a house [but was] now finished, so he [was] hoping that the [carpal tunnel] symptoms [would] improve," and Dr. Pinn noted that Plaintiff exhibited "[n]o pain," Plaintiff's peripheral neuropathy symptoms were "fairly well controlled with pregabalin," he "[e]ncouraged [Plaintiff] strongly to at least decrease to [a] maximum of [two] beers daily and . . . consider quitting," and Plaintiff had a history of "alcoholic cardiomyopathy," which was "asymptomatic." (*Id.* at 2221-23.)

On this record, the Court finds that the ALJ's interpretation of the record was rational and the ALJ did not err in discounting Plaintiff's symptom testimony on the grounds that (1) his neuropathy was well controlled with medication, and (2) his shoulders improved with treatment. *See Vazquez*, 2023 WL 5453198, at *1 (holding that the ALJ "provided legally sufficient reasons to reject [the claimant's] subjective claims," and noting that "the ALJ's alternative interpretation of [certain record evidence was] at least equally rational, and the reasoning [was] legally sufficient").

The Court notes that Plaintiff's primary argument on appeal appears to be that the ALJ's RFC and VE hypothetical, both of which reflected that Plaintiff could stand and walk for six hours during an eight-hour workday (*see* Tr. 36-42, 192, 201), are legally insufficient because they do not account for his testimony that he frequently needs to elevate his legs and can only be on his feet for two hours. (*See* Pl.'s Br. at 8-10, citing Tr. 26-27, 56-57, 460 on three occasions; Pl.'s Reply Br. at 1-3, citing Tr. 26-27, 56-60, 460 and Tr. 23-34, 460-61; *cf.* Tr. 26-27, 29, Plaintiff testified the neuropathy in his feet "gets worse within a couple hours" of walking or

standing, he relieves his symptoms by sitting "straight up with [his] legs straight out for a period of time" at hip level or above, and he is "good for about two hours on [his] feet" and then needs to "sit with [his] feet straight out"; *id.* at 56-57, Plaintiff testified that he would need to sit down after two hours of standing at a workstation because of the neuropathy in his feet; *id.* at 460-62, 465, 467, Plaintiff reported that his ability to stand and walk is limited, he "spend[s] most of [his] day with [his] feet elevated to try and relieve [his] foot pain," and "laying down is a bad position for [his] neuropathy").

Plaintiff argues that his testimony as to his walking and standing limitations should be "credited as true" and that if the ALJ had "properly credited" such testimony, the RFC would have included "greater standing and walking limitations." (Pl.'s Br. at 9.) Plaintiff suggests that his RFC should "include[] a limitation to four hours [of] standing and walking," which would in turn "rule[] out" the jobs the VE identified as suitable for Plaintiff "or greatly diminish[]" the number of jobs that the VE testified were available in the national economy. (Pl.'s Br. at 10; Pl.'s Reply at 3.) Plaintiff's proposed limitation is inconsistent with Plaintiff's treating provider's observations that his peripheral neuropathy is well controlled with medication alone.

In addition to the foregoing, the Court finds that in discounting Plaintiff's testimony, the ALJ appropriately considered that "the medical record revealed [that Plaintiff] continued engaging in activities that likely exacerbated his condition." (Tr. 197.) The ALJ cited two examples in support of this finding. (*Id.*) First, the ALJ cited the November 27, 2018 orthopedic surgery consultation note, which, as discussed, reflects that Plaintiff's provider "recommended [that Plaintiff] limit movements that exacerbate his pain," which Plaintiff admitted "would be difficult given his job as an independent con[tractor]." (*Id.*, citing Tr. 2116.) Second, the ALJ cited Dr. Pinn's January 29, 2020 annual exam, which, as discussed, reflects that Plaintiff

expected his carpal tunnel symptoms to improve because he finished painting a house. (*Id.*, citing Tr. 2221.)

The record evidence discussed herein supports the ALJ's finding that contrary to his provider's recommendation, Plaintiff continued to engage in work activities that exacerbated his shoulder symptoms and pain. It was appropriate for the ALJ to discount Plaintiff's symptom testimony on this ground. *See Rhinehart v. Colvin*, No. 2:15-cv-01704-AC, 2016 WL 7235680, at *11-12 (D. Or. Dec. 12, 2016) ("Claimant did not cease these [work] activities even though they appear to have exacerbated or prolonged his subjective pain symptoms. . . . [T]here is substantial evidence to support the ALJ's determination that Claimant's work activities conflict with his pain allegations. . . . The ALJ provided two . . . clear and convincing rationales to discount Claimant's subjective symptom allegations: (1) lack of objective medical evidence and (2) Claimant's work activity. . . . Accordingly, any further error was harmless, and the ALJ's findings must be affirmed."); *see also English v. Saul*, 840 F. App'x 241, 242 (9th Cir. 2021) (holding that the ALJ "provided clear and convincing reasons to discount [the claimant's] testimony, including the fact that [the claimant] had . . . . declined to follow treatment recommendations"); *Jones v. Saul*, 818 F. App'x 781, 781-82 (9th Cir. 2020) (affirming the ALJ's discounting of the claimant's testimony based on his "failure to comply with treatment recommendations").

## 2.    Conservative Treatment

In addition to Plaintiff's improvement, engagement in activities that exacerbated his symptoms and were inconsistent with his provider's recommendations, and ability to control his peripheral neuropathy with medication, the ALJ also discounted Plaintiff's testimony on the ground that his "[t]reatment for [his] alleged impairments during the relevant period was limited to conservative treatment options, [i.e.,] pain medication, injections, and physical therapy."

PAGE 18 – OPINION AND ORDER

(Tr. 196; *see also id.* at 194-95, noting that "there was no surgical indication" and Plaintiff was "not a surgical candidate"). Plaintiff argues that substantial evidence does not support the ALJ's discounting of his testimony based on his "conservative treatment," but acknowledges that his "treatments may not have been extraordinary" and "surgery was not recommended." (Pl.'s Br. at 7-8.)

The Court concludes that the ALJ appropriately discounted Plaintiff's testimony on the ground that his providers largely recommended conservative treatment. Courts have upheld an ALJ's discounting of a claimant's testimony in similar situations. For example, in *Matsukado v. Kijakazi*, No. 20-15727, 2021 WL 5446021, at *1 (9th Cir. Nov. 22, 2021), the Ninth Circuit upheld the ALJ's discounting of the claimant's testimony where, as here, the record included evidence demonstrating that the claimant responded favorably to the conservative treatment of physical therapy. *Id.* Similarly, in *Miner v. Colvin*, 609 F. App'x 454, 454-55 (9th Cir. 2015), the Ninth Circuit held that "[t]he ALJ properly relied on . . . the inconsistency between [the claimant's] allegations that her impairments were disabling and her conservative treatment." *Id.* In support, the Ninth Circuit noted that "[t]he record reflect[ed] that despite [the claimant's] allegations that she suffered disabling pain for years, [the claimant's] doctors did not recommend surgeries or other aggressive treatment" and the claimant "chose exercises [as her treatment option]." *Id.*

The parties do not specifically address the issue of whether Plaintiff's cortisone injections amounted to conservative treatment. (*See* Pl.'s Br. at 7-8, contesting the ALJ's general reliance on Plaintiff's conservative treatment because, according to Plaintiff, his symptoms persisted and acknowledging that Plaintiff's "treatments may not have been extraordinary"; Def.'s Br. at 7, ECF No. 40, arguing that the ALJ reasonably discounted Plaintiff's testimony based on his

"conservative treatment"). Whether a claimant's injections amount to conservative treatment turns on case-specific facts. *See Revels v. Berryhill*, 874 F.3d 648, 667 (9th Cir. 2017) ("Any evaluation of the aggressiveness of a treatment regimen must take into account the condition being treated.").

Courts have varied with respect to whether a claimant's injections are conservative treatment under the circumstances presented. For example, in *Revels*, the Ninth Circuit held that the ALJ erred in discounting the claimant's "testimony on account of the supposedly 'conservative' treatment she received." 874 F.3d at 667. After noting that the claimant "received facet and epidural injections in her neck and back, as well as steroid injections in her hands," and that the claimant "was prescribed a variety of medications for her pain, including Valium, Vlector, Soma, Vicodin, Percocet, Neurontin, Robaxin, Trazodone, and Lyrica," the Ninth Circuit explained that "[t]he ALJ provided no explanation why he deemed this treatment 'conservative' for fibromyalgia." *Id.* The Ninth Circuit also observed that it had "previously 'doubt[ed] that epidural steroid shots to the neck and lower back qualify as conservative medical treatment.'" *Id.* (quoting *Garrison*, 759 F.3d at 1015 n.20)); *see also Fryer v. Kijakazi*, No. 21-36004, 2022 WL 17958630, at *2 (9th Cir. Dec. 27, 2022) ("In previous cases, [the Ninth Circuit has] indicated that epidural steroid injections might serve as a nonconservative treatment for fibromyalgia." (citing *Revels*, 874 F.3d at 667)).

Similarly, in *Rawa v. Colvin*, 672 F. App'x 664, 667 (9th Cir. 2016), the Ninth Circuit held that the record contradicted and "controlling case law" conflicted with the ALJ's discounting of the claimant's "pain testimony on the ground that her treatment had been 'essentially routine and conservative' in nature." *Id.* In support, the Ninth Circuit noted that the claimant "underwent extensive testing after her alleged disability onset date, some of which

involved having injections in her spine and metal needles placed into her legs," and the claimant "received multiple epidural steroid injections, and was prescribed a series of pain medications." *Id.* The Ninth Circuit noted that "[s]uch procedures and treatments are neither routine nor conservative." *Id.* (citing *Garrison*, 759 F.3d at 1015 n.20). The Ninth Circuit added that there was "no evidence in the record that [the claimant] declined other, recommended treatment," and the claimant's "treating physician agreed that her desire to avoid further surgery was reasonable, and told her that he could not guarantee that future procedures would not cause her even greater pain." *Id.* Recognizing that a "conservative course of treatment is not a proper basis for rejecting the claimant's [testimony] where the claimant has a good reason for not seeking more aggressive treatment," the Ninth Circuit held that "the ALJ's finding regarding [the claimant's] course of treatment [was] not a specific, clear, and convincing reason for rejecting [her] testimony." *Id.* (simplified); *see also Gilliland v. Saul*, 821 F. App'x 798, 799 (9th Cir. 2020) (holding that the ALJ erred in discounting a rheumatologist's opinion based on the plaintiff's "routine and conservative treatment, where [the ALJ] pointed to no evidence that [the plaintiff's fibromyalgia] treatment, which included several pain medications and trigger point injections, was 'conservative'").

By contrast, in *Fry v. Berryhill*, 749 F. App'x 659, 660-61 (9th Cir. 2019), the Ninth Circuit rejected the claimant's argument that the ALJ improperly characterized his treatment (in particular, an injection and cervical fusion surgery) as conservative and related reliance on the *Garrison* footnote:

> [W]e reject Fry's argument that the ALJ erred in characterizing her treatment as conservative, particularly regarding her injection and cervical fusion surgery. Fry cites *Garrison* . . . where the court reversed an ALJ's denial of benefits and stated that '[i]n any event, we doubt that epidural steroid shots to the neck and lower back qualify as conservative medical treatment.' Contrary to Fry's argument, the *Garrison* court did not base its holding on whether the claimant's treatment was

conservative or not. Rather, the court held that the ALJ erred by discounting the claimant's testimony where there was no evidence in the record that the provided treatment alleviated the claimant's pain. . . . Furthermore, even if the ALJ erred by describing Fry's treatment as conservative, the ALJ offered other clear and convincing reasons for discounting Fry's testimony, rendering any error harmless.

*Id.* (quoting *Garrison*, 759 F.3d at 1015 n.20 and citing *Garrison*, 759 F.3d at 1015).

Similarly, in *Armfield v. Kijakazi*, No. 22-35127, 2023 WL 2728817, at *1 (9th Cir. Mar. 31, 2023), the Ninth Circuit explained that "[a] favorable response to conservative treatment 'undermines [a claimant's] reports regarding the disabling nature of [her] pain,'" and that "[t]he record support[ed] the ALJ's finding that [the claimant's] 'pain symptoms and medical impairments' were 'managed conservatively with medication, physical therapy, and therapeutic injections.'" *Id.* (quoting *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008)); *see also Centanni v. Berryhill*, 729 F. App'x 560, 562 (9th Cir. 2018) (holding that "[t]he ALJ properly rejected [the claimant's] testimony based on his conservative and noninvasive treatment, including refusals of analgesics, a steroid injection, an ankle brace, and ankle surgery"); *Hanes v. Colvin*, 651 F. App'x 703, 705-06 (9th Cir. 2016) (holding that the ALJ appropriately "supported his [discounting of the claimant's testimony] with evidence of [the claimant's] conservative treatment plan, which consisted primarily of minimal medication, limited physical therapy, and gentle exercise"); *but cf. id.* at 706 (Watford, J., dissenting) ("[T]he ALJ's finding that [the claimant] had received 'essentially routine and/or conservative' treatment, not 'the type of medical treatment one would expect for a disabled individual,' is frankly baffling . . . [given that] [the claimant] relied on high doses of a variety of powerful narcotic painkillers (including Opana, Fentanyl, and morphine), and . . . has undergone spinal injections and radiofrequency ablation.").

The Court concludes that the ALJ appropriately discounted Plaintiff's testimony based on his conservative treatment of his shoulder conditions, and that even if the ALJ erred in describing

Plaintiff's shoulder treatment as conservative, any error was harmless because the ALJ offered other clear and convincing reasons, discussed above, for discounting Plaintiff's testimony. Notably, during his November 2018 orthopedic consultation, Plaintiff's provider explained that Plaintiff was "not a surgical candidate" and that her treatment recommendations consisted of cortisone injections, "stretching and [physical therapy] exercises at home," and "limiting movements that exacerbate [the] pain" (i.e., many movements that Plaintiff performed as part of his work as an independent contractor, as opposed to a less physically demanding job). (*See* Tr. 2115-17, stating as much and noting that Plaintiff reported that he "work[ed] as an independent contractor," he was "very active with his shoulder for work," and he was "aware that his work aggravate[d] his shoulder pain"; *see also id.* at 36, describing Plaintiff's past work as a painter and house repairer as "medium" exertion jobs). Plaintiff's providers also advised him to "use ice/heat [as needed]." (*Id.* at 1739, 1748, 2148, 2156.) Based on this and other evidence, the ALJ reasonably determined that Plaintiff engaged in conservative treatment of his shoulder conditions.

On this record, the Court finds that the ALJ properly discounted Plaintiff's testimony as to the severity of his shoulder limitations based on his conservative treatment and that even if the ALJ did err in this regard, the ALJ did not commit harmful error in discounting Plaintiff's testimony because the ALJ provided other clear and convincing reasons, supported by substantial evidence, for doing so.

### 3.    Conclusion

Based on the foregoing reasons, the Court concludes that the ALJ did not commit harmful error in discounting Plaintiff's symptom testimony. *See Jones*, 818 F. App'x at 781-82 (holding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony and thus "[a]ny error in the ALJ's additional reasons for discounting [the claimant's]

symptom testimony [were] harmless"); *Sims v. Berryhill*, 704 F. App'x 703, 704 (9th Cir. 2017)

(affirming the ALJ's discounting of the claimant's testimony because the ALJ "provided at least

one clear and convincing reason supported by substantial evidence" for doing so); *see also*

*Gilliland v. Saul*, 821 F. App'x 798, 799 (9th Cir. 2020) (noting that an error is harmless if the

ALJ "provided at least one valid reason to discount [the] testimony") (citation omitted);

*Johaningmeier v. Berryhill*, No. 3:16-02027-AC, 2018 WL 385035, at *6 (D. Or. Jan. 11, 2018)

(agreeing with the Commissioner that the ALJ did not commit harmful error in discounting the

claimant's symptom testimony because "the ALJ provided at least one other clear and

convincing reason").

## II.     MEDICAL OPINION EVIDENCE

Plaintiff also argues that substantial evidence does not support the ALJ and Appeals

Council's explanation for discounting the opinion of Dr. Bailey, the medical expert who testified

at the first hearing. (Pl.'s Br. at 5, 9-10.) Plaintiff fails to demonstrate that the ALJ committed

harmful error.

### A.     Applicable Law

As the parties acknowledge (*see* Pl.'s Br. at 9-10; Def.'s Br. at 14), the new regulations

apply here because Plaintiff filed his applications after March 27, 2017. *See Woods v. Kijakazi*,

32 F.4th 785, 787-92 (9th Cir. 2022) (observing that "[t]he new regulations apply to [a

claimant's Social Security case if] she filed her claim on or after March 27, 2017," and that the

new regulations displace the "irreconcilable" and "incompatible" specific and legitimate reasons

standard); *see also Petritz v. Kijakazi*, No. 22-35155, 2022 WL 17592191, at *1 (9th Cir. 2022)

(explaining that "the standard under the new regulations . . . [did] not apply to [the claimant's]

case because [he] filed his application for benefits before [March 27,] 2017" (citing *Woods*, 32

F.4th at 789)).

Under the new regulations, "'[t]he most important factors' that [an ALJ] considers when evaluating the persuasiveness of medical opinions are 'supportability' and 'consistency.'" *Woods*, 32 F.4th at 791 (quoting 20 C.F.R. § 404.1520c(a)).[3] Supportability refers to "the extent to which a medical source supports the medical opinion by explaining the 'relevant . . . objective medical evidence,'" *id.* at 791-92 (quoting 20 C.F.R. § 404.1520c(c)(1)), and consistency refers to "the extent to which a medical opinion is 'consistent . . . with the evidence from other medical sources and nonmedical sources in the claim.'" *Id.* at 792 (quoting 20 C.F.R. § 404.1520c(c)(2)). An ALJ "must 'articulate . . . how persuasive' [he] finds 'all of the medical opinions' from each doctor or other source, . . . and 'explain how [he] considered the supportability and consistency factors' in reaching [his] findings.'" *Id.* (quoting 20 C.F.R. §§ 404.1520c(b), 404.1520c(b)(2)).

The new regulations reflect that an ALJ is not required to make specific findings regarding a medical source's relationship with the claimant, i.e., "the length and purpose of the treatment relationship, the frequency of examinations, the kinds and extent of examinations that the medical source has performed or ordered from specialists, and whether the medical source has examined the claimant or merely reviewed the claimant's record." *Id.* (quoting 20 C.F.R. §§ 404.1520c(b)(2), 404.1520c(c)(3)(i)-(v)). Nor is an ALJ required to make findings regarding specialization or "other factors that tend to support or contradict a medical opinion[, such as the medical source's] familiarity with the other evidence in the claim or . . . understanding

---

[3] The ALJ correctly applied the new regulations and the identical regulations applicable to SSI claims, which are codified at 20 C.F.R. § 416.920c. (*See* Tr. 192); *see also Reynolds v. Kijakazi*, No. 21-35672, 2022 WL 4095381, at *1 (9th Cir. Sept. 7, 2022) (applying the new regulations in evaluating claims for disability insurance benefits and SSI (citing 20 C.F.R. § 416.920c and *Woods*, 32 F.4th at 791-92)); *Fryer v. Kijakazi*, No. 21-36004, 2022 WL 17958630, at *1 (9th Cir. Dec. 27, 2022) (noting that the new, parallel regulations for claims for disability insurance benefits and SSI are "codified at 20 C.F.R. [parts] 404 [and] 416," respectively (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5844 (Jan. 18, 2017))).

of . . . disability program[] policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(b)(2), 404.1520c(c)(4)-(5).

If, however, an ALJ finds that medical opinions "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ] will articulate how [he] considered the . . . factors in paragraphs (c)(3) through (c)(5)," *id.* § 416.920c(b)(3), i.e., the medical source's relationship with the claimant, specialization, and facts that support or contradict the medical opinion. *Id.* § 416.920c(c)(3)-(5); *see also Woods*, 32 F.4th at 792 (making a similar observation regarding the factors in paragraphs (c)(3) through (c)(5)).

A district court reviews the ALJ's evaluation of a medical opinion for substantial evidence. *See Woods*, 32 F.4th at 787 ("Now, [under the new regulations,] an ALJ's decision, including the decision to discredit any medical opinion, must simply be supported by substantial evidence."); *id.* at 792 ("Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."); *Metcalf v. Kijakazi*, No. 22-35201, 2022 WL 17592194, at *1 (9th Cir. Dec. 13, 2022) (observing that "under the revised regulations . . . , the ALJ's evaluation of a medical opinion is reviewed for substantial evidence" (citing *Woods*, 32 F.4th at 789)).

## B.    Analysis

Plaintiff fails to demonstrate that the ALJ and Appeals Council committed harmful error in discounting Dr. Bailey's opinion.

Plaintiff's argument that the ALJ and Appeals Council erred in discounting Dr. Bailey's opinion is premised entirely on Plaintiff's assertion that the ALJ and Appeals Council failed to consider that his neuropathy is "only managed with a combination of medication and elevating

his feet." (Pl.'s Reply Br. at 2-3) (bold and caps omitted). As explained above, substantial evidence supports the ALJ's finding that Plaintiff's neuropathy was well controlled with medication alone, and the Court cannot disturb the ALJ's rational interpretation of the record. The Court reiterates that Plaintiff's providers did not state that Plaintiff's ability to control his neuropathy symptoms depended on the combination of medication and elevating the feet throughout the day.

The Court also notes that Plaintiff acknowledges that the second medical expert, Dr. Vu, opined that Plaintiff can stand and walk for six hours per day. (Pl.'s Reply Br. at 2.) The ALJ and Appeals Council agreed that Dr. Vu's opinion was generally persuasive and consistent with, among other things, Plaintiff's improvement and "fairly robust" activities. (Tr. 198; *see also id.* at 4-7, 23-24.) Plaintiff does not challenge the ALJ's reasons for finding generally persuasive Dr. Vu's opinion. Relying largely on his testimony, however, Plaintiff does argue that the evidence contradicts Dr. Vu's opinion regarding his standing and walking limitations. (*See* Pl.'s Reply Br. at 2-3.) As discussed, the ALJ appropriately discounted Plaintiff's testimony. The ALJ provided several similar, unchallenged reasons for finding Dr. Vu's opinion persuasive. (*See* Tr. 198.) Thus, the Court finds that the ALJ permissibly weighed the medical opinions in the record.

For these reasons, the Court finds that substantial evidence supports the ALJ and Appeals Council's explanation for discounting Dr. Bailey's opinion, and that Plaintiff failed to demonstrate harmful error. *See Kitchen v. Kijakazi*, 82 F.4th 732, 740 (9th Cir. 2023) ("Under the revised regulations, an ALJ need only provide 'an explanation supported by substantial evidence' [for discounting a physician's opinion]." (quoting *Woods*, 32 F.4th at 792)); *Stockdale v. Kijakazi*, No. 22-16626, 2023 WL 7675562, at *1 (9th Cir. Nov. 15, 2023) (noting that the

"ALJ permissibly weighed the medical opinions in the record," the "ALJ reasonably concluded that [the] [c]laimant's reported activities of daily living were inconsistent with [the physician's] assessment," a "conflict between a physician's opinion and claimant's activity level is a legally sufficient reason for rejecting it," and the claimant cited "portions of the record showing that she struggled with certain tasks" but other records suggested otherwise (citing *Ford*, 950 F.3d at 1155)).

## CONCLUSION

For the reasons stated, the Court AFFIRMS the Commissioner's decision because it is free of harmful legal error and supported by substantial evidence.

**IT IS SO ORDERED.**

DATED this 12th day of January, 2024.

HON. STACIE F. BECKERMAN
United States Magistrate Judge